August 26, 2026

**VIA ECF**
Patricia S. Dodszuweit, Clerk of Court
U.S. Court of Appeals for the Third Circuit
21400 United States Courthouse
601 Market Street
Philadelphia, PA 19106-1790

Re: *Supplemental Brief in Nos. 25-1555, et al. (consolidated)*
*Atlas Data Privacy Corp. v. We Inform LLC, et al.*

Dear Ms. Dodszuweit,

Although the New Jersey Supreme Court has now held that Daniel's Law does not require a mens rea for actual damages, Appellants' facial motion to dismiss still fails for at least three independent reasons. First, this case remains premature: as emphasized in *Moody v. NetChoice*, 603 U.S. 707 (2024), facial invalidation of a statute requires a record to properly assess the proportion of any unconstitutional applications. Yet Appellants' strategic choice to appeal the denial of their motions to dismiss, instead of proceeding to discovery, means the record is bereft of evidence on which to make such a finding. Second, even assessed now, this facial challenge fails: the hypothetical strict-liability applications of this law pale in comparison to other plainly constitutional applications, and these strict-liability applications satisfy constitutional scrutiny regardless. Finally, even if this Court declares on this posture that those applications are unconstitutional, the remedy would be to carve out those applications, not to completely invalidate this vital statutory scheme.

1. Appellants' facial challenge fails on this motion-to-dismiss posture, without prejudice to a future motion. While the New Jersey Supreme Court has now held that applications of the law *could* include suits for civil damages that fail to plead mens rea, Appellants' facial overbreadth theory requires them to prove that these applications—even assuming they are unlawful—are "substantial" relative to the law's "legitimate sweep." *NetChoice*, 603 U.S. at 723. Yet there is no record to assess how common such applications would be in practice, as a result of Appellants' choice to press this facial challenge at the pleading stage.

The Supreme Court has, in recent years, repeatedly stressed the importance of this record-based inquiry. Because facial invalidation is "strong medicine" to be used "sparingly and only as a last resort," *Broadrick v. Oklahoma*, 413 U.S. 601, 613 (1973), an overbreadth challenger ultimately needs to establish a "lopsided ratio" of

impermissible to permissible applications, *United States v. Hansen*, 599 U.S. 762, 770 (2023). Appellants must satisfy that burden with evidence that this "law's unconstitutional applications substantially outweigh its constitutional ones," to ensure that courts can "undertake the needed inquiries," *NetChoice*, 603 U.S. at 724, without reverting to "hypothetical" applications, *see Wash. State Grange v. Wash State Repub. Party*, 552 U.S. 442, 450 (2008). Otherwise, courts risk blocking democratic "laws from being implemented in constitutional ways," based on mere "speculation about the law's" likely "future enforcement." *NetChoice*, 603 U.S. at 723. The upshot is simple: actual "evidence of both the existence and prevalence of such unconstitutional applications" is "key." *Mazo v. N.J. Sec'y of State*, 54 F.4th 124, 152 (3d Cir. 2022). Without it, courts must handle constitutional claims like this facial overbreadth challenge "as they usually do—case by case." *Hansen*, 599 U.S. at 770.

Appellants have failed to satisfy their burden. Though it is now clear a claim *could* be brought for actual civil damages without having to show negligence, there is no evidence whatsoever showing how often—if ever—the law *would* be enforced where the defendant acted without at least negligence. This is a consequence of Appellants' litigation choices: rather than proceeding to discovery and building a factual record to enable the District Court in the first instance to "undertake the needed inquiries," Appellants elected to appeal the District Court's denial of their motions to dismiss. So this Court is left with "hypothetical" and "imaginary" applications of the law, which are impermissible bases for facial invalidation. *See*, *e.g.*, *Grange*, 552 U.S. at 450; *Mazo*, 54 F.4th at 152. And there are strong reasons to question how likely those applications will be in the real world: plaintiffs (and the New Jersey Attorney General) have throughout read the statute as requiring at least negligence for actual damages—and advocated for that position—making it unlikely that either would seek to bring strict-liability actions. *See* Atlas Br. 51-54; NJAG Br. 44-50. This means that "evidence of both the existence and prevalence" of such applications is both lacking and especially speculative. *See Mazo*, 54 F.4th at 152. Appellants can of course try to build a record showing those applications exist as this case progresses. But absent such a record, the facial invalidation they seek is unavailable.

Ultimately, Appellants "chose to litigate these cases as facial challenges, and that decision comes at a cost." *NetChoice*, 603 U.S. at 723. Like myriad other courts, this Court should decline to dispense the "strong medicine" of facial relief on such an underdeveloped record. *See*, *e.g.*, *Boelter v. Advance Mag. Publishers Inc.*, 210 F. Supp. 3d 579, 603 (S.D.N.Y. 2016); *Stark v. Patreon, Inc.*, 656 F. Supp. 3d 1018, 1039 (N.D. Cal. 2023); *see also NetChoice*, 603 U.S. at 744.

2. Even if this Court undertook to determine whether impermissible applications "substantially outweigh" permissible ones at this stage, Appellants fall far short

of their heavy burden. Instead, their facial claim suffers from two independently dispositive problems: strict-liability applications are unlikely to be frequent compared to other applications, and these applications are nonetheless constitutional.

For one, regardless of whether strict liability applications of Daniel's Law are unconstitutional, they are unlikely to be the requisite lion's share of the applications; to the contrary, applications with a mens rea of negligence (or higher) are far more likely. Those latter applications, even though above the statutory minimum, are part of the statute's "plainly legitimate sweep." *NetChoice*, 603 U.S. at 723; *see* NJAG Br. 35-44, 50-55. And it is plain why they are more likely: while the law has now been construed to contain no mens rea requirement, it does require that a defendant received a valid, written request from a covered person and failed to comply with that request for more than ten business days—two weeks. N.J. Stat. Ann. § 56:8-166.1(a)(1). Considering those limits, it is far likelier a business's failure to comply resulted from carelessness rather than once-in-a-lifetime circumstances like a "fire, hurricane, [or] computer failure." *See* Appellants' Br. 60 (citing JA119); *see also Hansen*, 599 U.S. at 770 (warning against reliance on "fanciful" applications of a law to "justify facial invalidation"). And as a practical matter, given that the plaintiffs (and the NJAG) thought this law *did* require negligence, it is particularly unlikely they would seek to enforce it in those extreme hypothetical applications.

For another, Appellants have not established that such (at most rare) strict-liability applications are unconstitutional. The core concern regarding mens rea in First Amendment cases is chill: that without some mental state to protect them, individuals will refrain from even unregulated speech. But here, there is little reason for such concern: as this Court has recognized, "the criterion that justifies restricting the speech … is clear and objective," making it easy for parties to determine their legal obligations. *Cf.* Order 8. There is no guesswork involved in deciding what cannot be disclosed, so parties are unlikely to withhold further data than necessary. This is especially true given that the heartland of applications involves commercial speech, NJAG Br. 29-33, a context in which concern about chilling speech "applies weakly, if at all," given the profit motive and savvy to publish data to the full extent of one's legal authority. *See*, *e.g.*, *Bates v. State Bar of Arizona*, 433 U.S. 350, 380 (1977); *Rad v. Att'y Gen.*, 983 F.3d 651, 662 (3d Cir. 2020) ("[T]he overbreadth doctrine does not apply to commercial speech."). It is unlikely data brokers will forgo profit by preemptively removing data beyond the law's reach.

Nor is the lack of mens rea proof of inadequate tailoring. *Cf.* Order 7 (noting strict liability only "suggests" inadequate tailoring). Daniel's Law is still carefully tailored in myriad other respects to cover the least speech possible to protect these critical public-safety interests. *See* NJAG Br. 39-44. The law, *inter alia*, proscribes

disclosure of only two pieces of data (home address and unpublished home phone number); applies to a narrow set of persons; relies on an opt-in regime in which covered persons must first provide a defendant with valid, written notice; and allows ample time to comply even after the request. N.J. Stat. Ann. § 56:8-166.1. Especially given reduced concerns about chill in this context, the Legislature did not need to adopt a mens rea to adequately tailor this statute, especially as Daniel's Law affords much more time for compliance than similar laws, NJAG Br.11 n.1, reducing the risk it would impose liability on a company that actually acted without fault.

3. Finally, if this Court were to side with Appellants on the facial question, the remedy would be to sever, or invalidate, the unconstitutional applications of the law—not to strike down the rest of this critical public-safety law in its entirety.

Severability is a question of state law, and state severability law is clear. Whenever "a portion of a statute" is found "unconstitutional, the Legislature has mandated a presumption of severability." *State v. Higginbotham*, 257 N.J. 260, 281 (2024) (citing N.J. Stat. Ann. § 1:1-10). That means the rest of the law survives "so long as 'the invalid portion is independent,' and the remainder of the statute, without the invalid provision, can 'form[] a complete act within itself.'" *Id.* State courts even engage in "judicial surgery" to remedy a constitutional flaw—an undertaking the New Jersey Supreme Court expressly did not (and could not) reach here. *See*, *e.g.*, *Town Tobacconist v. Kimmelman*, 94 N.J. 85, 104 (1983) ("[A] court has the power to engage in 'judicial surgery' and through appropriate construction restore the statute to health."); *Chamber of Com. of U.S. v. State*, 89 N.J. 131, 152 (1982) (same).

That is so even when the text of a statute is not linguistically divided between valid and invalid applications—so long as a statute has invalid applications and valid applications, the latter should "nonetheless be sustained." *Clayton v. Kervick*, 52 N.J. 138, 157 (1968). *Clayton* itself involved a challenge to a state statute that governed a government entity's ability to construct and lease educational facilities for "participating colleges," which included public and private institutions of higher education, without a textual distinction between sectarian and non-sectarian private institutions. *See* N.J. Stat. Ann. § 18A:72A-3. While the state high court accepted that the law was invalid applied to sectarian institutions (on Establishment Clause grounds), it found the rest of the law could remain in effect, meaning the government could continue to construct and lease facilities for other institutions of higher education. *See* *Clayton*, 52 N.J. at 146, 157 (finding trial court holding that the law's "invalidity as to sectarian institutions" did not require "a declaration of unconstitutionality as to the entire statute" was "clearly correct"). So even though the text did not spell out "participating public, private, and sectarian colleges" such that specific words could be severed, constitutional applications could still be upheld consistent with either the

State's "traditional severability principles" and/or "the principle that a statute will be upheld to the fullest extent constitutionally permissible." *Id.* at 157.[1]

Those principles apply equally here, where this Court can invalidate unconstitutional applications of the actual-damages provision without invalidating the rest of the provision (much less the law) in its entirety. Though this provision has been held to require no mens rea, that simply means that *any* mens rea (or no mens rea) is sufficient for liability. *See* N.J. Stat. Ann. § 56:8-166.1(c)(1). So just as this Court could sever the phrase "without fault" from a statute that held liable individuals who acted "with knowledge, recklessness, negligence, or without fault," it can invalidate strict-liability applications of Daniel's Law with the same effect. After all, hypothetical strict-liability applications of the law are wholly "independent" of applications to defendants who act with knowledge, recklessness, or negligence—so invalidating strict-liability suits will have no effect on "the remainder of the statute." *Higginbotham*, 257 N.J. at 281. And it is beyond doubt that the Legislature would prefer this Court to excise just a few hypothetical applications of the law rather than to strike it (or any provision) down as a whole, *see* N.J. Stat. Ann. 1:1-10, particularly when such applications had been disclaimed by the parties anyway. There is thus no basis to invalidate applications of Daniel's Law to defendants who acted with negligence or more culpable mental states merely because some hypothetical defendants could theoretically face liability without a culpable mental state at all.

Respectfully submitted,

*/s/ Michael L. Zuckerman*

Michael L. Zuckerman
Associate Attorney General
Office of the New Jersey Attorney General

Dated: August 26, 2026
cc: All counsel (via ECF)

---

[1] *Cf., e.g.*, *Ayotte v. Planned Parenthood of N. New England*, 546 U.S. 320, 328-29 (2006) (explaining that when a court encounters statutory text that is "invalid as applied to one state of facts and yet valid as applied to another," it should "try to limit the solution to the problem" by, for instance, severing the problematic applications "while leaving other applications in force"); *Tennessee v. Garner*, 471 U.S. 1, 11 (1985) (limiting applications of statute that allowed use of deadly force against fleeing suspects only to dangerous fleeing suspects, even though the text drew no distinction between dangerous or non-dangerous suspects); *NRDC v. Wheeler*, 955 F.3d 68, 81 (D.C. Cir. 2020) ("It is a routine feature of severability doctrine that a court may invalidate only some applications even of indivisible text, so long as the valid applications can be separated from invalid ones.").